**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0603-19T1

COOPER HOSPITAL
UNIVERSITY MEDICAL
CENTER on assignment
by DALE MECOUCH,

      Plaintiff-Respondent,

v.

SELECTIVE INSURANCE
COMPANY OF AMERICA,

      Defendant-Appellant.

_____

          Argued October 15, 2020 – Decided November 18, 2020

          Before Judges Whipple, Rose, and Firko.

          On appeal from the Superior Court of New Jersey, Law Division, Camden County, Docket No. L-0316-18.

          Laura A. Brady argued the cause for appellant (Coughlin Duffy, LLP, attorneys; Laura A. Brady, of counsel and on the briefs; Christa McLeod, on the briefs).

Stanley G. Wojculewski argued the cause for respondent (Costello Law Firm, attorneys; Stanley G. Wojculewski, on the briefs).

Susan Stryker argued the cause for amicus curiae Insurance Council of New Jersey (Bressler Amery & Ross, PC, attorneys; Susan Stryker, of counsel and on the brief).

Greenbaum Rowe Smith & Davis, LLP, attorneys for amicus curiae New Jersey Hospital Association (Robert B. Hille, of counsel and on the brief; Neil Sullivan and John W. Kaveney, on the brief).

PER CURIAM

In this appeal, we address whether Medicare or a private insurance carrier has primary payment responsibility for hospital services rendered for ongoing medical injuries arising from a 1977 automobile accident. Defendant, Selective Insurance Company of America appeals from an August 16, 2019 order denying its motion for summary judgment; an August 26, 2019 order granting plaintiff, Cooper Hospital University Medical Center's summary judgment motion and ordering defendant to pay plaintiff $769,323.06 plus interest, fees and costs; and a September 13, 2019 order finding those reasonable attorneys' fees and costs to be $33,340. We reverse.

The seeds of this controversy were planted when Dale Mecouch was injured in a 1977 automobile accident, which left him with paraplegia. Mecouch

2

filed suit against defendant, and in 1979, secured an order that required defendant pay for Mecouch's medical expenses under his father's no-fault insurance Personal Injury Protection (PIP) policy. At that time, no-fault policies offered unlimited medical coverage. Since that order, defendant has paid most of Mecouch's medical expenses arising from the accident.

On December 11, 2015, defendant sent Mecouch a letter advising him that it was not the primary payer for any claim related to treatment for the 1977 accident. The letter informed Mecouch that pursuant to section 111 of the Medicare, Medicaid, and SCHIP[1] Extension Act (MMSEA) of 2007, and the Medicare Second Payer Statute (MSP), 42 U.S.C. § 1395y(b), Medicare remains the primary payer on no-fault PIP claims where the date of injury was prior to December 5, 1980. It stated:

> Accordingly, it is respectfully requested that you notify your medical providers to cease billing [defendant] as the primary insurance carrier for treatment related to the above referenced claim and instruct them to submit all bills for any July 16, 1977 accident[-]related treatment to Medicare. If Medicare denies any accident[-]related bill[s] or if a deductible or co-payment is billed to you, kindly forward the bill and Medicare's Explanation of Benefits (EOB) for our consideration.

---

[1] State Children's Health Insurance Program.

A-0603-19T1

Mecouch was treated in plaintiff's hospital from February 2016 through May 2016 for care that was still attributable to the 1977 accident. Plaintiff billed defendant first, in the amount of $853,663. On September 20, 2016, defendant sent plaintiff a letter denying payment, stating "Medicare is the primary payer for the charges submitted. Please submit these charges to Medicare for consideration. Any denied charges may be resubmitted with Medicare's EOB for reconsideration." Subsequently, plaintiff submitted the bill to Medicare.

A National Standard Intermediary Remittance Advice form from Novitas Solutions lists a covered amount of $84,339.94 and patient responsibility, the deductible plus co-payment, of $12,236. Medicare remitted payment to plaintiff through Novitas Solutions for the covered amount of $84,339.94, stating the patient's responsibility was $12,236. Plaintiff submitted the remainder of the bill, $12,236 to defendant for payment.

Defendant wrote back denying plaintiff's request for $12,236 in connection with Mecouch's treatment, stating "as you know M[edicare] is primary for this patient, you billed M[edicare] and received payment and [b]alance [b]illing is prohibited, therefore, [defendant] will not be considering

4

your submission for payment." Defendant asserted billing primacy was Medicare, then Tricare,[2] and then defendant.

On January 3, 2018, plaintiff filed a complaint seeking payment of PIP benefits pursuant to N.J.S.A. 39:6A-4(a), from defendant, for the $853,663 it had incurred in expenses, asserting defendant "wrongfully failed and refused to pay plaintiff the aforementioned benefits as required by the laws of the State of New Jersey and the applicable automobile insurance policy."[3]

Cross-motions for summary judgment were filed on July 15, 2019. And after reviewing the cross-motions, the court ruled that under N.J.S.A. 39:6A-4, defendant is responsible for Mecouch's PIP benefits covering the bodily injury that resulted from the automobile accident and that no other limitations are contained in that part of the statute. The court stated all issues regarding entitlement to coverage concluded with the 1979 order and granted summary judgment in favor of plaintiff, while entering judgment against defendant in the amount of $769,323.06. The court also found that under the PIP statute, plaintiff

---

[2] Defendant later conceded including Tricare was a mistake.
[3] Mecouch assigned his right to receive direct payment of no-fault PIP medical expense benefits to plaintiff, and, pursuant to N.J.S.A. 2A:25-1, Lech v. State Farm Ins. Co., 335 N.J. Super. 254 (App. Div. 2000) and Tirgan v. Mega Life & Health Ins., 304 N.J. Super. 385 (Law Div. 1997), plaintiff asserted it had standing to litigate the issue of non-payment of the benefits against defendant.

A-0603-19T1

is entitled to counsel fees because the claim was not properly denied. Plaintiff, the successful party, was entitled to the recovery of counsel fees under Rule 4:42-9(a)(6), which the court found to be $33,340.[4]

This appeal followed. With leave granted, amici curiae, Insurance Council of New Jersey and New Jersey Hospitals Association, also filed briefs.

We review a grant of summary judgment de novo, applying the same standard as the trial court. Woytas v. Greenwood Tree Experts, Inc., 237 N.J. 501, 511 (2019) (citing Bhagat v. Bhagat, 217 N.J. 22, 38 (2014)). Summary judgment must be granted when "there is no genuine issue as to any material fact challenged" and "the moving party is entitled to a judgment or order as a matter of law." Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 405-06 (2014) (quoting R. 4:46-2(c)).

The Social Security Amendments of 1965, Pub. L. No. 89-97, 79 Stat. 286, 290 (Medicare statute), enacted a primacy structure wherein (1) the federal government was required to pay for covered medical services rendered to Medicare-eligible beneficiaries under section 101, except for workers' compensation benefits, as provided by section 1862(b). This means Medicare

---

[4] On November 14, 2019, plaintiff's representative Carpenter submitted an affidavit stating Novitas Solutions, acting as the fiscal intermediary, accepted plaintiff's refund to Medicare in the amount of $84,339.94 on August 8, 2019.

was primary payer in all circumstances other than workers' compensation. Reaching such a goal was expressly recognized by Congress when it enacted the Medicare as Secondary Payer Act (MSP Act), 42 U.S.C. § 1395y(b)(2)(A), in 1980, noting that the original version of the statute rendered Medicare "primary payor" for services to Medicare beneficiaries, except for workers' compensation. H.R. Rep. No. 96-1167, at 389 (1980).

Defendant, the responsible insurer under the 1979 court order was, and in fact continued to act as, the "primary payer" of Mecouch's accident-related medical expenses before Mecouch was Medicare-eligible. Afterwards, defendant continued to do so for thirty-seven years.

In 1980, section (b)(2)(A) of the MSP Act made Medicare a secondary payer when payment has been made, or can reasonably be expected to be made, under a workers' compensation law or, among other things, no-fault insurance. This Act gave Medicare "residual rather than primary liability" for payment of services resulting from an injury sustained in an auto accident where payment could also be made under an automobile insurance policy. H.R. Rep. 96-1167, at 389 (1980). This federal report states that post-MSP Act, "[i]t is expected that Medicare will ordinarily pay for the beneficiary's care in the usual manner and then seek reimbursement from the private insurance carrier after, and to the

7

extent that, such carrier's liability under the private policy for the services has been determined." Ibid. The report further explains:

> [u]nder present law, Medicare is the primary payor (except where a workmen's compensation program is determined to be responsible for payment for needed medical services) for hospital and medical services received by beneficiaries. This is true even in cases in which a beneficiary's need for services is related to an injury or illness sustained in an auto accident and the services could have been paid for by a private insurance carrier under the terms of an automobile insurance policy. As a result, Medicare has served to relieve private insurers of obligations to pay the costs of medical care in cases where there would otherwise be liability under the private insurance contract. The original concerns that prompted inclusion of this program policy in the law—the administrative difficulties involved in ascertaining private insurance liability and the attendant delays in payment—no longer justify retaining the policy, particularly if it is understood that immediate payment may be made by Medicare with recovery attempts undertaken only subsequently when liability is established.
>
> [Ibid.]

The MSP Act was "designed to curb skyrocketing health costs and preserve the fiscal integrity of the Medicare system," Fanning v. United States, 346 F.3d 386, 388 (3d Cir. 2003), and was a "cost-cutting measure . . . designed to make Medicare a 'secondary' payer" when there was other insurance available, In re

Dow Corning Corp., 250 B.R. 298, 335 (E.D. Mich. Bankr. 2000) (quoting Health Ins. Ass'n of Am. v. Shalala, 23 F.3d 412, 414 (D.C. Cir. 1994)).

However, the MSP Act only applies to services related to accidents that occur on or after the effective date of December 5, 1980. See 42 C.F.R. § 411.50(a) (stating the provisions of subpart (c), which explains how Medicare does not pay for services for which payment has been made or can reasonably be expected to be made under automobile no-fault insurance, do not apply to any services required because of accidents that occurred before December 5, 1980); see also Colonial Penn Ins. Co. v. Heckler, 721 F.2d 431, 440 (3d Cir. 1983) (stating the Secretary adopted the route more favorable to insurers and applied the MSP regulations to services required because of accidents that occur after December 5, 1980).

After the MSP Act made Medicare the secondary payer, "[i]f the primary payer has not paid and will not promptly do so . . . Medicare can conditionally pay the cost of the treatment." Stalley v. Methodist Healthcare, 517 F.3d 911, 915 (6th Cir. 2008). If Medicare pays for an item or service payable by the beneficiary's insurance, the payment is conditional and subject to reimbursement, and to recover a conditional Medicare payment, the United States "may bring an action against" the insurance company. Dow Corning, 250

A-0603-19T1

B.R. at 336 (citing 42 U.S.C. §§ 1395y(b)(2)(B)(i) to (ii)).  However, for costs arising out of accidents that occurred before December 5, 1980, the Centers for Medicare and Medicaid Services does not seek to recover payments.[5]

Therefore, Medicare was the primary payer before the MSP Act and the MSP Act permitted Medicare to remain the primary payer for injuries arising from accidents that occurred before December 5, 1980.  Because of this, if Mecouch is indeed eligible for Medicare, which both parties assert he became eligible for twenty-four months after his accident, Medicare serves as the primary payer.  While plaintiff argues defendant acted as if and seemed to believe it was the primary payer from 1977 until 2015, when it sent the letter to Mecouch, defendant's mistake does not change the law.  If anything, plaintiff likely reaped the benefits of this mistake in prior billings.

---

[5] "[The Centers for Medicare and Medicaid Services] has consistently applied the [MSP] provision for liability insurance . . . effective December 5, 1980.  As a matter of policy, Medicare does not assert an MSP liability insurance-based recovery claim against . . . payments where the date of incident . . . occurred before December 5, 1980."  U.S. Dept. of Health and Human Servs., Center for Medicare and Medicaid Servs., Liability Insurance (Including Self-Insurance): Exposure, Ingestion, and Implantation Issues and December 5, 1980 (Aug. 19, 2014), https://www.cms.gov/Medicare/Coordination-of-Benefits-and-Recovery/Coordination-of-Benefits-and-Recovery-Overview/Non-Group-Health-Plan-Recovery/Downloads/ExpIngestionImpRevisedOct11.pdf.

Defendant asserts that when the trial court held the effect of N.J.S.A. 39:6A-6, is to grant defendant an offset against the bill's full charges in the amount of the $84,339.94 Medicare payment, it was error because the federal law mandate of Medicare primacy is determinative of plaintiff's asserted entitlement to recovery from defendant and the trial court's construction of the No-Fault Act and the related ruling in plaintiff's favor yields a direct conflict between federal and state law, which requires the state law to yield, and which "ultimately . . . endorses a violation by [plaintiff] of federal law governing Medicare."  We agree.

New Jersey's comprehensive no-fault statutory system is designed to ensure those injured in automobile accidents are compensated promptly for their injuries by immediate recourse to insurance or public funds; its goal is to ensure there are "financially responsible persons available to meet the claims of persons wrongfully injured in automobile accidents."  Craig and Pomeroy, N.J. Auto Ins. Law, § 1:1 (2021) (quoting Ross v. Transp. of N. J., 114 N.J. 132, 135 (1989) (quoting Selected Risks Ins. Co. v. Zullo, 48 N.J. 362, 371 (1966))).  The purpose of the No-Fault Act "is to afford reparation or at least partial reparation for the objectively probable economic losses resulting from automobile accidents" and "requires prompt payment for medical expenses . . . to certain

11

classes of persons injured in an automobile accident without regard to negligence, liability or fault and without having to await the outcome of protracted litigation." Olivero v. N.J. Mfrs. Ins. Co., 199 N.J. Super. 191, 197 (App. Div. 1985). "The PIP carrier is required under the [No-Fault Act] to pay all benefits when due." Aetna Cas. & Sur. Co. v. Para Mfg, Co., 176 N.J. Super. 532, 535 (App. Div. 1980) (citing N.J.S.A. 39:6A-5 to -6; Solimano v. Consolidated Mutual Ins. Co., 146 N.J. Super. 393, 396-97 (Law Div. 1977)).

Under the collateral source rule, N.J.S.A. 39:6A-6, as it existed in 1977, the benefits of N.J.S.A. 39:6A-4 were "payable as loss accrues, upon written notice of such loss and without regard to collateral sources, except that benefits collectible under workmen's compensation insurance, employees['] temporary disability benefit statutes and [M]edicare provided under [f]ederal law, shall be deducted from the benefits collectible . . . ." Frazier v. Liberty Mut. Ins. Co., 150 N.J. Super. 123, 129 (Law Div. 1977) (quoting N.J.S.A. 39:6A-6).

In Lusby v. Hitchner, we noted that the New Jersey Supreme Court made clear in Aetna Insurance Co. v. Gilchrist Bros., Inc., 85 N.J. 550 (1981), "the legislative intent in enacting no-fault was to make PIP benefits the immediate and primary source of medical expense payment except as otherwise provided

A-0603-19T1

by N.J.S.A. 39:6A-6 . . . ." Lusby v. Hitchner, 273 N.J. Super. 578, 585 (App. Div. 1994).

However, both no-fault insurance and Medicare have gone through many changes since 1977. In short, the trial court's ruling cannot stand due to the current workings of Medicare, the adoption of fee schedules by Medicare, the non-adoption of in-patient hospital fee schedules by New Jersey's no-fault scheme, more recent interpretations of both, and federal preemption.

Based on our review of the record and the relevant statutes and regulations, the trial court's ruling impermissibly approves plaintiff's violation of federal law governing Medicare benefits, because plaintiff cannot accept the payment from defendant awarded by the trial court without violating its obligations under federal law as a Medicare-participating provider.

Plaintiff, as a participating provider, was required by federal law to bill Medicare and accept its disposition of the charges as payment in full under 42 U.S.C. § 1395cc. This means the provider must bill Medicare only and the beneficiary can only be charged for deductible and co-insurance amounts. Holle v. Moline Pub. Hosp., 598 F. Supp. 1017, 1019-20 (C.D. Ill. 1984) (interpreting 42 U.S.C. § 1395cc(a)(1)(A)). Federal law dictates that Medicare participating providers "are prohibited from trying to collect the remaining balance," which

is the difference between the billed costs of treatment and the Medicare reimbursement payments, and are contractually obligated to accept the Medicare reimbursement payments as a condition of their participation in the Medicare system. Froedtert Mem'l Lutheran Hosp., Inc. v. Nat'l States Ins. Co., 765 N.W.2d 251, 254 (Wis. 2009).

Medicare, in the present day, is administered by the CMS. Froedtert, 765 N.W.2d at 253. CMS contracts with hospitals to provide patient care for Medicare beneficiaries under 42 U.S.C. § 1395cc, which requires participating providers, in exchange for receiving Medicare payments, to refrain from charging beneficiaries for "items or services" already paid by Medicare. Id. at 253-54 (quoting 42 U.S.C. § 1395cc(a)(1)(A)); see also Holle, 598 F. Supp. at 1019. The provider may only charge the beneficiary for deductible or co-insurance amounts. Holle, 598 F. Supp. at 1020.

In the Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, 103 Stat. 2106, Congress authorized the use of Medicare fee schedules to replace the previous methodology of customary, prevailing and reasonable charges. Under the new fee schedule method, participating hospitals were to charge each patient at the hospital's standard rates for the actual services rendered, and then Medicare was to reimburse the providers at the previously-contracted Medicare

A-0603-19T1

reimbursement rates.  Froedtert, 765 N.W.2d at 254.  After Medicare has reimbursed the provider, the participating hospital is "prohibited from trying to collect the remaining balance—the difference between the billed costs of treatment and the Medicare reimbursement payments.  Ibid. (citing 42 U.S.C. 1395cc(a)(1)(A)).  They are contractually obligated to accept the Medicare reimbursement payments as a condition of their participation in the Medicare system."  Ibid. (citing 42 U.S.C. § 1395cc(a)(1)(A)).  Participating hospitals are thus prohibited from what is referred to as "balance billing," for instance, "[u]nder its agreement with Medicare, the [h]ospital may not file a lien for amounts that represent charges for covered services for which Medicare has been billed by the provider, except for deductible or co-insurance amounts."  Holle, 598 F. Supp. at 1021.  "Payment of the provider's charges by Medicare extinguishes the beneficiary's debt to the provider."  Ibid.

Here, after defendant informed plaintiff that Mecouch was covered by Medicare, plaintiff billed Medicare and Medicare remitted payment under its fee schedule.  Thus, as a Medicare participating hospital, plaintiff was required to accept Medicare's payment as extinguishing Mecouch's debt except for the deductible and co-payment amounts.  Plaintiff did so, billing defendant for the deductible and co-payment amounts, which defendant was required to pay on

15

Mecouch's behalf, but did not, something defendant now concedes was a mistake. Therefore, Medicare's payment extinguished Mecouch's debt except for the deductible and co-payment amounts, and plaintiff was not permitted to "balance bill" defendant for its total costs of treating Mecouch.

As explained on the Medicare website, when there is more than one payer, "coordination of benefits" rules decide which one pays first. U.S. Centers for Medicare & Medicaid Servs., How Medicare Works with Other Insurance, Medicare.gov, (last visited Oct. 22, 2020), https://www.medicare.gov/supplements-other-insurance/how-medicare-works-with-other-insurance. The "primary payer" pays first, up to the limits of its coverage, and the "secondary payer" only pays if there are costs the primary insurance did not cover. Id. Under 42 U.S.C. §§ 1395y(b)(2)(B)(i) to (iii), if the primary payer does not or cannot reasonably be expected to make payment promptly, Medicare may make a conditional payment, for which Medicare can later seek reimbursement from the primary payer, initiating legal action if necessary. However, if there is a dispute as to whether an individual is covered by Medicare, the insured must go through an administrative process and hearing pursuant to 42 U.S.C. § 405(b).

Here, Medicare, as the primary payer (because of the exception to the MSP Act for Mecouch's 1977 accident) would pay plaintiff up to its limits, now according to a fee schedule, and defendant would be required to pay the costs Medicare did not cover, the deductible and co-insurance, of $12,236. Even where Medicare is not the primary payer, the statutes provide that it is to make a conditional payment if the primary payer does not pay promptly, and then seek reimbursement from the insurance company later, if it turns out Medicare is not liable. Further, plaintiff is not permitted to bill defendant for the balance of its expended costs under 42 U.S.C. § 1395cc(a)(1)(A).

Thus, to require defendant to pay the over-$800,000 bill upfront, then to bill Medicare, interferes with Medicare's methods of paying first according to its fee schedule, as well as its prohibition on balance-billing, presenting a conflict with, and an obstacle to, the federal scheme. This sequence of payment would essentially be balance-billing, albeit in a reverse order, which is prohibited for participating hospitals that contract with Medicare. Accordingly, interpreting N.J.S.A. 39:6A-6, as applied to those cases that fall under the MSP Act exception, requiring the insurance company to pay first cannot stand as it presents a conflict with the federal statute barring balance billing, along with an obstacle to the federal method of utilizing Medicare as the primary payer, thus

implying preemption. Nor is it necessary to rely on this interpretation to effectuate the purpose of the New Jersey No-Fault Act: prompt payment regardless of fault. Therefore, Medicare will promptly pay, even where the MSP Act applies, and Medicare may make a conditional payment when the primary payer does not pay promptly.

Lusby recognized that the MSP Act, rendering Medicare as a secondary payer for accidents after December 5, 1980, supersedes the "contrary provision of N.J.S.A. 39:6A-6," which Lusby stated "apparently" renders Medicare primary to no-fault. Lusby, 273 N.J. Super. at 585-86. The Lusby court noted under the Supremacy Clause of Article VI of the United States Constitution, "contrary provisions of state no-fault law are preempted by the federal [MSP Act]." Ibid. Here, as discussed, Mecouch's accident fell under an exception under the MSP Act, so the provision of N.J.S.A. 39:6A-6 that "apparently" makes Medicare primary is not pre-empted in this case.

The Lusby court also noted the workers' compensation carrier is primarily liable for any "benefits collectible" under the workers' compensation statute. Lusby, 273 N.J. Super. at 585. In Talmadge v. Burn, decided in 2016, the court stated that workers' compensation "is the primary source of satisfaction of the employee's medical bills, as provided by the collateral source rule, N.J.S.A.

39:6A-6, which 'relieves the PIP carrier from the obligation of making payments for expenses incurred by the insured which are covered by workers' compensation benefits.'" Talmadge v. Burn, 446 N.J. Super. 413, 418 (App. Div. 2016) (quoting Lefkin v. Venturini, 229 N.J. Super. 1, 7 (App. Div. 1988)). "Where only workers' compensation benefits and PIP benefits are available, the primary burden is placed on workers' compensation as a matter of legislative policy by way of the collateral source rule of N.J.S.A. 39:6A-6." Ibid. (quoting Lefkin, 229 N.J. Super. at 9 (citing Gilchrist Bros., 85 N.J. at 550)).

In Lambert v. Travelers Indemnity Co. of America, also decided in 2016, we held that "workers' compensation benefits are the primary source of recovery for injuries suffered by employees in a work-related automobile accident," and because of that, "PIP insurers are relieved from the obligation to pay medical expenses under N.J.S.A. 39:6A-6." Lambert v. Travelers Indem. Co. of Am., 447 N.J. Super. 61, 71 (App. Div. 2016). The Lambert court held "[t]he collateral source rule does not make workers' compensation insurance part of the PIP no-fault system; rather it shifts the burden of providing insurance from the automobile insurance system to the workers' compensation system." Id. at 74. "Indeed, the statutory words 'deducted from' are most clearly understood as

shifting the insurance coverage from automobile insurance to workers' compensation insurance." Ibid.

Although these cases deal with workers' compensation, the practical application is the same for those situations where the MSP Act does not apply, such as here, where Mecouch's accident occurred before December 5, 1980. In this case, the burden is shifted from the no-fault PIP carrier to Medicare; Medicare takes the primary payer position; and Medicare pays according to its own fee schedule, separate from that of New Jersey no-fault insurance. See In re the Commissioner's Failure to Adopt 861 CPT Codes and To Promulgate Hospital and Dental Fee Schedules, 358 N.J. Super. 135, 150 (App. Div. 2003). Then, the Medicare participating hospital must accept Medicare's fee schedule payment as extinguishing the beneficiary's debt other than co-insurance and deductibles, which are then covered by the PIP carrier. Interpreting N.J.S.A. 39:6A-6 as to Medicare in the same way it is interpreted in Talmadge and Lambert as shifting the responsibility to Medicare is logical and efficient, and comports with and does not present a conflict or obstacle to the federal Medicare method of payment.

However, again, where there is no exception to the MSP Act, Medicare is the secondary payer and the PIP insurer would have to pay the bill according to

New Jersey no-fault fee schedules. Here, that would be the entire bill because there is no fee schedule for inpatient hospital services.

Although the hospital expended over $800,000 in treating Mecouch, its contract with Medicare requires them to consider Mecouch's bill extinguished on Medicare's payment according to its fee schedule. It follows, then, that Mecouch only incurred expenses of the co-insurance and deductible amount of $12,236.

Even if defendant did mistakenly serve as primary payer for thirty-seven years, well after Mecouch likely became eligible for Medicare, that does not change the law, and if anything, plaintiff has benefitted from prior payments reflecting the fully-billed amount. Plaintiff received prompt payment from Medicare once directed to bill Medicare, but then chose to refund that amount to pursue the fully-billed amount.

We reverse and remand to order defendant to pay $12,236 due from Mecouch's co-insurance and deductible after Medicare submitted payment to plaintiff, plus interest. Although plaintiff returned the Medicare payment, and it is possible that payment is no longer recoverable, doing so was plaintiff's choice in a bid to recover its fully-billed amount. We do not consider such payments defendant's responsibility.

A-0603-19T1

Going forward, Medicare should be billed primarily, with defendant liable to pay Mecouch's costs of co-insurance and deductible, afterwards. However, should Medicare find Mecouch is not covered under its program, defendant is liable for the amounts according to New Jersey's no-fault insurance scheme, which here, is the fully-billed amount, whether or not an appeal is brought to Medicare under Olivero and Para Mfg. The trial court must also determine appropriate fees and costs because plaintiff is now unsuccessful. But, similarly, defendant is now only partially successful because it is still responsible to pay the $12,236 in co-insurance and deductible immediately, which it did not pay before.

Reversed and remanded for the entry of an order consistent with this opinion.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0603-19T1